IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


EDWARD G. FARLEY,               )
                               )
v.                             )     NO. 2:11-0123
                               )
CAROLYN W. COLVIN,             )
       Acting Commissioner of  )
       Social Security[1]      )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as

provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 15) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On March 16, 2009, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of December 1, 2005, due to a spinal cord injury, carpal tunnel syndrome, migraine headaches, dizziness, hearing loss, "ringing" in his ear, tremors, mood swings, hiatal hernia, and acid reflux. (Tr. 111, 120, 143-47, 169.) His applications were denied initially and upon reconsideration. (Tr. 58-66, 71-78.) On December 8, 2010, the plaintiff testified at a video hearing before Administrative Law Judge George Evans III ("ALJ") (tr. 30-53), and the plaintiff amended his alleged onset date to August 9, 2005. (Tr. 33.) On February 23, 2011, the ALJ entered an unfavorable decision (tr. 15-25), and the plaintiff filed a request for review of the hearing decision. (Tr. 9.) The Appeals Council denied the plaintiff's request for review on November 22, 2011, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on April 26, 1950, and he was fifty-five years old as of August 9, 2005, his amended alleged onset date. (Tr. 143.) He completed high school and two years of college, and he has worked as a carpenter, construction worker, sanitation worker, and dietary aide. (Tr. 152-59, 173.) He has been unemployed since November of 2004. (Tr. 133.)

## A. Chronological Background: Procedural Developments and Medical Records

### 1. Physical Impairments

On April 24, 2009, the plaintiff presented to the White County Health Department with complaints of heart burn, indigestion, and pain in his right hip and low back. (Tr. 227.) On exam,

he had a tremor in his hands and "point tenderness" in his right hip but exhibited full range of motion. (Tr. 228.) He was diagnosed with gastroesophageal reflux disease ("GERD"), "bursitis/arthritis," and "essential tremors."[2] *Id.* He was advised to take over-the-counter pain medication and was prescribed Protonix to treat GERD. *Id.* X-rays taken on May 1, 2009, showed a normal lumbar spine but a cervical spine with "[m]ild degenerative facet changes on the left side at C3-4 and C4-5" with marginal osteophyte formation. (Tr. 209-10.)

On May 8, 2009, the plaintiff returned to the White County Health Department for a follow-up visit. (Tr. 224-25.) He reported that he had continued indigestion and heartburn with occasional nausea and that his hand tremors increased when he was anxious or nervous. *Id.* He also reported having pain in his neck, shoulder, back, and hip that became worse with changes in the weather. (Tr. 225.) He was diagnosed with anxiety, depression, and "chronic pain arthralgia" and was advised that fluoxetine[3] could help relieve his hand tremors, but he declined a prescription. *Id.* He returned to the clinic on June 17, 2009, for a refill of Protonix. (Tr. 221.)

On May 20, 2009, Dr. Jerry Lee Surber, a Disability Determination Services ("DDS") consultative physician, physically examined the plaintiff. (Tr. 215-19.) Dr. Surber did not have the plaintiff's medical records available for review, and the plaintiff reported that he had "not seen a physician since 2006," adding that "none of his allegations ha[d] been proven or documented as valid by a physician." (Tr. 215.) The plaintiff complained of shortness of breath without accompanying

---

[2] The plaintiff was also diagnosed with "MHPE," but it is not clear what ailment this acronym represents. (Tr. 228.)

[3] Fluoxetine is a serotonin reuptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, and panic disorder. Saunders Pharmaceutical Word Book 299 (2009) ("Saunders").

chest pain, "intermittent hearing problems with tinnitus and vertigo or dizziness," GERD with hiatal hernia, anxiety, depression, arthritis, migraine headaches, tremors in his hands and lower lip, and pain in his neck, shoulders, and lower back. *Id.* Dr. Surber observed that the plaintiff was "very anxious" but alert, oriented, and cooperative with the exception of "refus[ing] to attempt any tandem or heel toe walks." (Tr. 216-218.) The plaintiff "appeared shaky whether standing on his right or his left leg" and had a "waddling side-to-side type gait" but did not use a cane or assistive device. (Tr. 217-18.)

Dr. Surber diagnosed the plaintiff with "[o]ngoing alcohol and marijuana dependency;" "[s]hortness of breath on minimal exertion with no chest pain consistent with chronic obstructive pulmonary disease;" "[h]istory of having intermittent hearing loss, tinnitus, and vertigo;"[4] "[GERD] with hiatal hernia and ongoing depression and anxiety;" and "[p]ain all worse in cold and rainy weather accompanied by stiffness and fatigue." (Tr. 218.) According to Dr. Surber, the plaintiff exhibited "decreased voluntary mobility in his left shoulder . . . , but no limitations regarding the functional mobility in any of his others [*sic*] areas of complaint nor in any of his extremities or joints." *Id.* Dr. Surber also noted that the plaintiff exhibited "very minimal tremors in his lower lip and in both of his hands intermittently" and that the plaintiff told him that "these usually occur when he is under stress." (Tr. 219.) He concluded that the plaintiff could "occasionally lift or carry at least 10 to 35 pounds during up to one-third to one-half of an 8-hour workday" and could "stand or walk with normal breaks for up to 2 to 4 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday." (Tr. 218.)

---

[4] Dr. Surber suggested that the plaintiff's symptoms of hearing loss, tinnitus, and vertigo indicated possible Meniere's disease but noted that the plaintiff had not been formally diagnosed and that "none of these symptoms were present" during the exam. (Tr. 218.)

On July 22, 2009, Dr. William L. Downey, a nonexamining DDS consultative physician, reviewed the plaintiff's medical record and determined that the plaintiff's alleged physical impairments were not severe either singly or in combination. (Tr. 243-46.) Dr. Downey explained that the plaintiff's "[a]lleged pain is not credible based on [full range of motion] throughout," imaging of his back and neck, and his having "no motor/sensory deficits." (Tr. 246.) Dr. Downey also found that the medical evidence did "not substantiate alleged dizziness, tinnitus or tremors." *Id.* On October 15, 2009, Dr. Reeta Misra, a nonexamining DDS consultative physician, "affirmed" Dr. Downey's assessment after finding that the plaintiff did not allege any worsening of his conditions and had no new medical records pertaining to treatment of physical impairments. (Tr. 303.)

### 2. Mental Impairments

On May 13, 2009, Jerell F. Killian, M.S., a DDS consultative psychological examiner, completed a psychological evaluation. (Tr. 211-13.) The plaintiff reported that he suffered from "depression due to his circumstances," "used marijuana to offset pain on a daily basis for approximately thirty-five years," and "twice attempted suicide in his twenties during breakup of relationships." (Tr. 212.) The plaintiff also reported that he had "rapid shifts in mood," questioned his reason for living, and became extremely agitated by "boom boxes" and people who demonstrate lack of respect for authority or the elderly. *Id.* Mr. Killian observed that the plaintiff "exhibited no signs of distress;" "aberrant thinking;" "blocked or interrupted thoughts;" "psychomotor abnormalities such as tremor, agitation, or slowed responses;" and was "friendly, polite, and spontaneous." *Id.* Mr. Killian also observed that the plaintiff was alert and well oriented,

demonstrated "no limitations of memory, concentration, or reasoning," and showed no symptoms that "by themselves would be expected to significantly limit adaptability." (Tr. 212-13.) Mr. Killian concluded that the plaintiff was "suffering from emotional distress, primarily depression, but primarily due to situational factors and personal issues" and noted that the plaintiff reported that his "major problems [were] 'health and financial and not psychological'" and diagnosed the plaintiff with "adjustment disorder with mixed anxiety and depression" and "cannabis dependence." (Tr. 213.)

On June 1, 2009, the plaintiff was admitted to inpatient care in the crisis stabilization unit at Plateau Mental Health Center ("PMHC") after his niece reported her fears that he might attempt suicide. (Tr. 252-54, 291-302.) He reported having feelings of depression, anxiety, mood swings, and "passive" suicidal ideation. (Tr. 252, 292, 298.) PMHC staff noted that he had "[m]ajor external stressors with finances, no work and medical issues with chronic pain of back and neck." (Tr. 252.) He was diagnosed with "adjustment disorder, with mixed disturbance of emotions and conduct, acute" and "depressive disorder NOS." (Tr. 301-02.) He was given a current Global Assessment of Functioning ("GAF") score of 45[5] and was prescribed Celexa,[6] although he initially refused medication. (Tr. 302.)

---

[5] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 41 and 50 falls within the range of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[6] Celexa is an SSRI used to treat major depression, obsessive-compulsive disorder, post-traumatic stress disorder, and generalized anxiety disorder. Saunders at 141-42.

On June 2, 2009, the plaintiff exhibited "intrusive, almost hostile participation" in group activities and PMHC staff noted that his affect was "variable with extremes" and his mood was "very anxious." (Tr. 256.) His "inappropriate laughter and anger" disrupted the unit and required intervention. *Id.* Later, he indicated that he was scared and willing to begin taking Depakote as prescribed.[7] *Id.* The next day, June 3, 2009, the plaintiff reported feeling "much better" and was described by PMHC staff as "[f]riendly and sociable" and "[l]aughing, smiling [and] interacting well with others." (Tr. 260-61, 274-75.) His participation in group activities was "much improved and appropriate," his mood was "much calmer without episodic anger," and he was "[c]ompliant and appreciative of medication." (Tr. 262-63.) He reported that he felt better than he had in ten years. (Tr. 274.) On June 4, 2009, his participation was "appropriate;" however, his mood was "somewhat sad and anxious," and he expressed concerns over being discharged from inpatient care. (Tr. 265.) Although he reported feeling "100% better" and denied suicidal ideation, he also reported that he was "scared" and "[s]hared feelings of hopelessness regarding his future and living situation." (Tr. 265- 66.) He was discharged on June 4, 2009. (Tr. 268, 290.) His assigned GAF score remained at 45 while he was hospitalized at PMHC. (Tr. 275, 277.)

The plaintiff returned to PMHC for follow-up counseling on June 23, 2009. (Tr. 278-79.) A mental status exam was normal, and the plaintiff was diagnosed with depressive disorder NOS, cannabis dependence, and alcohol abuse and given a GAF score of 50. *Id.* PMHC staff planned for him to taper off of Depakote and begin taking Celexa. *Id.* On June 25, 2009, the plaintiff reported

---

[7] Depakote is an anticonvulsant used to treat seizures, manic episodes of bipolar disorder, and migraine headaches. Saunders at 210.

to PMHC staff that he was "homeless and worthless," and a plan was developed to help him improve his self image. (Tr. 269.)

On July 2, 2009, Cal VanderPlate, Ph.D., a nonexamining DDS consultant, completed a Psychiatric Review Technique ("PRT") (tr. 229-41) and determined that the plaintiff had a mild adjustment disorder with mixed features as well as cannabis dependence. (Tr. 232, 237.) Dr. VanderPlate found that the plaintiff's mental impairments were not severe (tr. 229), and that the plaintiff had only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 239.)

During counseling sessions at PMHC on July 8, and 23, 2009, the plaintiff "show[ed] some improvement in outlook on life" but expressed concern over obtaining housing and disability benefits. (Tr. 270-71, 281-83.) His assessed GAF score remained at 50, and PMHC staff increased his prescribed dosage of Celexa and prescribed Vistaril.[8] (Tr. 282.) The plaintiff missed a therapy session on August 5, 2009 (tr. 272), but returned to PMHC on September 3, 2009, reporting that he was "not doing well" and citing "multiple medical complaints and financial stressors." (Tr. 248-50, 284-86.) He reported having "ongoing nervousness and anxiety" as well as tremors, but the PMHC clinician saw "[n]o visible tremors" when the plaintiff attempted to demonstrate them. (Tr. 248, 284.) He was assessed a GAF score of 50, and his prescriptions for Vistaril and Celexa were refilled. (Tr. 285.) He failed to attend his next scheduled therapy session on September 16, 2009, and it appears that he did not return to PMHC. (Tr. 273.)

Mr. Killian completed a second psychological evaluation on February 3, 2010, and found the plaintiff to have depressive disorder NOS and cannabis dependence. (Tr. 312-15.) Mr. Killian noted

---

[8] Vistaril is a "minor tranquilizer." Saunders at 758.

that he had trouble starting the session because of the plaintiff's "rantings" and "ramblings . . . regarding his health and financial difficulties and his struggle to get assistance, especially financial." (Tr. 312.)  When Mr. Killian "threatened to terminate the session," the plaintiff "acquiesce[d]," and once the session was on track, Mr. Killian found that the plaintiff was "well oriented," "participated appropriately," and "demonstrated adequate reasoning, concentration, and memory."  (Tr. 312-13.) The plaintiff reported that he was living with his niece and had a driver's license but no vehicle. (Tr. 314.)  Mr. Killian found that the plaintiff "maintain[ed] his own executive activities without assistance or prompting" and concluded that the plaintiff "described no symptoms which by themselves would be expected to significantly limit adaptability." *Id.*

Rebecca B. Sweeney, Ph.D., a nonexamining DDS consultant, completed a PRT on February 10, 2010 (tr. 321-33), and found that the plaintiff had mild restrictions of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and one or two episodes of decompensation.  (Tr. 331.) Dr. Sweeney found that the plaintiff's allegations were credible and that the severity of his alleged symptoms was "consistent with the objective findings."  (Tr. 333.)  She also found that, although Mr. Killian had previously opined that the plaintiff had no limitations, the plaintiff's "[activities of daily living] and behavior" during Mr. Killian's evaluation "indicate[d] moderate limitations."[9] *Id.* Dr. Sweeney noted that the plaintiff "cannot interact with the general public" but that "most of his other limitations appear to be related to physical problems and pain."  *Id.*

_____

[9] It is not entirely clear, but presumably Ms. Sweeney was referring to the plaintiff's behavior during Mr. Killian's second psychological evaluation on February 3, 2010.

Dr. Sweeney also completed a mental RFC assessment (tr. 335-337), in which she opined that the plaintiff had a marked limitation in his ability to interact appropriately with the general public as well as several moderate limitations in the areas of sustained concentration and persistence, social interaction, and adaptation. (Tr. 335-36.) Dr. Sweeney explained that the plaintiff could "understand and remember simple and 1-4 step detailed tasks, but [could not] make independent decisions at an executive level;" could "maintain attention and concentration for periods of at least two hours;" could "adapt to infrequent change;" and could "frequently relate to co-workers and occasionally to supervisors" but could not "interact with the general public." (Tr. 337.)

## B. Hearing Testimony

At the hearing before the ALJ on December 8, 2010 (tr. 30-53), the plaintiff was represented by counsel and testified that he was single, sixty years old, lived alone, and was 5'11" tall and weighed approximately 175-185 pounds. (Tr. 34, 36.) He testified that he had a valid driver's license but had not had a car since March 2009. (Tr. 34-35.) He testified that he did not smoke cigarettes, consumed alcohol in moderation, and last smoked marijuana a year before the hearing. (Tr. 35-36.) The plaintiff relayed that he had no income but received food stamps. *Id.* He testified that, in the past fifteen years, he typically worked in construction and only had jobs that were labor oriented. (Tr. 38.)

The plaintiff testified about several medical conditions that he believed limited his ability to work. (Tr. 38-40.) He explained that, since 2005, he had experienced pain in his upper torso that radiated into his wrists and legs and felt like an "electrical shock" when he rotated his neck. (Tr. 39, 41.) He rated his upper-torso pain as a nine on a ten-point scale and said that he took over-the-

counter medication because he did not have health insurance to pay for doctors' visits or prescription medication. (Tr. 42.) The plaintiff also described having low back pain that "creep[ed]" from his hip into his knee and ankle, causing numbness. (Tr. 42-43.) He rated his hip pain as a six out of ten. (Tr. 43.) He recounted having torn the rotator cuff in his left shoulder when he was a teenager and said that he had pain ever since that was "just like rheumatoid arthritis" and felt like "burning inside the socket." (Tr. 43-44.) He also testified that he experienced "pressure" and "hurting" in his sternum that he rated as a six out of ten and pain in his right knee that made it difficult for him to stand longer than one hour. (Tr. 44-45.) He also relayed having "blurred vision and dizziness and constant ringing in [his] ear." (Tr. 52.)

He related that he had difficulty walking more than three blocks, standing or sitting longer than one hour, and could not lift anything heavier than a jug of milk "more than once or twice without resting and recuperating." (Tr. 45-46.) When asked about his sleeping habits, the plaintiff testified that he did not sleep well and frequently needed to walk or sit up during the night to alleviate his pain. (Tr. 46.) He testified that his hobbies used to include golfing and fishing but that he was no longer able to do so because of limited mobility in his upper torso. (Tr. 37.)

The plaintiff explained that he went to PMHC on the recommendation of his niece after he "made the comment that [he was] turning 61 and [he did not] see any foreseeable thing for the future [and] that [he] might as well be dead or crawl in a cave and die." (Tr. 47.) He explained that, after a three day evaluation, he was prescribed medication but that "it was doing worse harm" and made him "more nervous and irritated." *Id.* He acknowledged that he had been depressed and had considered suicide and that he "still wonder[ed] about the future," explaining that he had "fifteen years of one downfall right after the other." (Tr. 47-48.)

11

The plaintiff said that he spent time with his cousin but otherwise did not socialize with the exception of one or two friends who visited "every now and then." (Tr. 48-49.) The plaintiff testified that he went to the grocery store about once a month with his niece because he did not have transportation and had difficulty shopping "with all the confusion and everything that people are causing." (Tr. 49-50.) He reported that he was nervous around people and had tremors when he was anxious, nervous, or "under pressure." *Id.* He also testified that driving made him nervous. (Tr. 51.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on February 23, 2011. (Tr. 15-25.) Based upon the record, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.     The claimant has not engaged in substantial gainful activity since August 9, 2005, the alleged amended onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following combined impairments: upper torso pain, low back pain, left shoulder rotator cuff tear, chest pain, knee and hip pain, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

                            \*\*\*

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

                            \*\*\*

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). Function by function, the

claimant is able to lift up to 50 pounds occasionally and up to 25 pounds frequently. The claimant has the ability to understand and remember simple and one-to-four step detailed tasks, but cannot make independent decisions at an executive level. The claimant has the ability to maintain attention and concentration for a period of at least two hours for the tasks described above. The claimant cannot interact with the general public. The claimant has the ability to frequently relate to coworkers and occasionally to supervisors. The claimant can adapt to infrequent change.

\*\*\*

6.    The claimant is capable of performing past relevant work as an industrial cleaner.[10] This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416. 965).

\*\*\*

7.    The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2005,[11] through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-24.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only

questions before this Court are whether the decision of the Commissioner is supported by substantial

evidence and whether the Commissioner employed the proper legal standards in reaching her

---

[10] Presumably, the ALJ was referring to the plaintiff's work as a sanitation worker, which the SSA had previously characterized as being "similar to industrial cleaner." (Tr. 170-71, 194, 343.)

[11] In section 7, the ALJ incorrectly referred to the plaintiff's alleged onset date as December 1, 2005 (tr. 24), although he correctly referred to the plaintiff's alleged amended onset date of August 9, 2005, in section 2. (Tr. 17.)

conclusion. 42 U.S.C. § 405(g). *See Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *see also Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on

the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g.*, *Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve

months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)); *see also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d

at 595; *see also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert.*

*denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines grid as a

means for the Commissioner of carrying his burden under appropriate circumstances). It remains

the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even

if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists

in significant numbers in the national economy that the plaintiff can perform, he is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health*

*& Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*,

773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process,

the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d

860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative

process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At

step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his

amended alleged disability onset date. (Tr. 17.) At step two, the ALJ determined that the plaintiff

had a severe impairment based on a combination of "upper torso pain, low back pain, left shoulder

rotator cuff tear, chest pain, knee and hip pain, anxiety, and depression." *Id.* At step three, the ALJ

found that the plaintiff's impairments, either singly or in combination, did not meet or medically

equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) At step

four, the ALJ determined that the plaintiff was capable of performing his past relevant work as an industrial cleaner. (Tr. 23.) In the alternative, the ALJ found at step five that there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 24.)

**C. The Plaintiff's Assertions of Error**

The plaintiff argues that the ALJ erred by "failing to set forth good cause for his rejection" of the GAF scores given to the plaintiff by PMHC staff. Docket Entry No. 16, at 21-22. The plaintiff also contends that the ALJ erred by finding that he could perform medium work and by not giving proper weight to Dr. Surber's opinion. *Id.* at 22. Finally the plaintiff maintains that the ALJ erred by failing to properly classify his age. *Id.* at 22-23.

**1. The ALJ did not err by failing to address the plaintiff's GAF scores.**

The plaintiff argues that the ALJ violated 20 C.F.R. § 404.1527 by "failing to set forth good cause for his rejection" of the GAF scores given to the plaintiff by PMHC staff. Docket Entry No. 16, at 21-22. During the course of the plaintiff's treatment at PMHC, his assessed GAF score was never higher than 50, indicating serious symptoms. (Tr. 249, 275, 277, 279, 282, 285, 290.) In his decision, the ALJ addressed the plaintiff's treatment history with PMHC but did not specifically address the plaintiff's GAF scores. (Tr. 21-22.)

In his supporting brief, the plaintiff fails to set forth a cogent argument in support of his contention that the ALJ was required to set forth good reasons for "his rejection" of the plaintiff's GAF scores. Docket Entry No. 16, at 21-22. The Court notes, initially, that the ALJ did not "reject" the plaintiff's GAF scores but, instead, did not specifically mention them when considering the

plaintiff's mental impairments. The plaintiff cites 20 C.F.R. § 404.1527, presumably for its statement that the SSA "will always give good reasons . . . for the weight we give your treating source's opinion." However, Sixth Circuit law is clear that there is no requirement for the ALJ to either specifically reference a plaintiff's GAF scores or to give a reason for not doing so. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. Feb. 9, 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."). *See also DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. Dec. 15, 2006).

As this Court has recognized, while "[a] GAF score can be helpful in assessing an individual's mental RFC," it is nevertheless "a physician's subjective evaluation and not raw medical data." *Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (J. Nixon) (citing *Kornecky*, 247 Fed. Appx. at 503, n.7; *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007)). The SSA has in fact declined to endorse the use of the GAF scale in implementing its Social Security disability programs, finding that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings." *Id.* (citing 65 Fed. Reg. 50,764-65 (Aug. 21, 2000); *Kennedy*, 247 Fed. Appx. at 766; *Deboard*, 211 Fed. Appx. at 411). Because a GAF score is "not essential" to determining a plaintiff's RFC, "the failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination." *Deboard*, 211 Fed. Appx. at 411 (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

While the ALJ did not specifically address the actual GAF scores given to the plaintiff during his treatment with PMHC, the ALJ did address in some detail the plaintiff's treatment history with PMHC. The ALJ noted that the plaintiff was admitted to PMHC for inpatient treatment before being

19

released for outpatient care and that he was "identified as suffering from depression and anxiety and prescribed medication to manage his symptoms." (Tr. 21.) The ALJ reviewed treatment notes from PMHC staff, noting that the plaintiff "responded well to medication, as he was able to better control his temper and mood swings, and was able to interact appropriately during his group therapy sessions with his peers." *Id.* The ALJ noted that, after he was released from PMHC on June 4, 2009, the plaintiff attended outpatient therapy sessions before discontinuing these sessions in September 2009. *Id.* The ALJ noted that, although the plaintiff initially showed improvement following his release from inpatient care, he later reported "not doing well," and "indicate[d] that his problems stem[med] from his multiple medical conditions and lack of financial resources, which are stressors." *Id.* However, the ALJ also noted that the plaintiff admitted that he stopped taking his medication. *Id.*

Since a GAF score is "only significant to the extent that it elucidates an individual's underlying mental issues," *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011), the ALJ appropriately considered the record as a whole rather than considering the plaintiff's GAF scores to be dispositive. The ALJ did not err by failing to specifically address the plaintiff's GAF scores.

## 2. The ALJ properly assessed Dr. Surber's medical opinion.

The plaintiff argues that the ALJ erroneously concluded that he was capable of performing medium work because the ALJ did not give "proper weight" to the opinion of Dr. Surber, a DDS consultative physician. Docket Entry No. 16, at 22. The plaintiff contends that, given the restrictions outlined by Dr. Surber, he would only be capable of a limited range of light work, not medium work as the ALJ found. *Id.*

After physically examining the plaintiff on May 23, 2009 (tr. 215-19), Dr. Surber concluded that the plaintiff could "occasionally lift or carry at least 10 to 35 pounds during up to one-third to one-half of an 8-hour workday" and could "stand or walk with normal breaks for up to 2 to 4 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday." *Id.* Although the ALJ explained that he had "considered Dr. Surber's opinion concerning [the plaintiff's] exertional level," he gave Dr. Surber's opinion "less weight." (Tr. 23.) The ALJ explained that "Dr. Surber's opinion is consistent with the record insofar as it appears the claimant is capable of the lifting of medium work. However, there is not sufficient evidence in the record to support the limited walking or standing restrictions." *Id.*

The plaintiff's argument centers on the ALJ's statement that Dr. Surber's opinion regarding the plaintiff's lifting capability was consistent with a classification of medium work. The plaintiff argues that Dr. Surber's lifting limitations are not consistent with the definition of medium work which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."[12] 20 C.F.R. § 404.1567(c). Thus, the plaintiff concludes that the ALJ mistakenly relied on Dr. Surber's opinion when concluding that the plaintiff could perform the lifting requirements of medium work.

The plaintiff's argument appears to be based on the premise that the ALJ intended to adopt Dr. Surber's lifting limitations but mistakenly believed that the limitations corresponded to medium-exertion work. The Court acknowledges that the ALJ's statement that Dr. Surber's opinion was consistent with the lifting requirements of medium work is confusing and incorrect. While

---

[12] "Frequent" is defined as occurring from 1/3 to 2/3 of the time. Dictionary of Occupational Titles 1013 (4th ed. 1991).

Dr. Surber's opinion did not foreclose the possibility of medium exertion work, it also did not provide that the plaintiff was capable of the lifting requirements of medium exertion work. However, the Court is not persuaded that the ALJ intended to adopt Dr. Surber's lifting limitations. First, the ALJ gave Dr. Surber's opinion less weight as a whole. (Tr. 23.) Second, when formulating the plaintiff's RFC on a function by function basis, the ALJ specifically chose lifting requirements that were greater than those suggested by Dr. Surber. (Tr. 19.) Thus, it is apparent that the ALJ did not intend to adopt Dr. Surber's lifting limitations verbatim.

Rather than relying exclusively on Dr. Surber's opinion to develop the plaintiff's RFC, the ALJ considered the entire record. The Regulations require that a plaintiff's RFC assessment "must be based on *all* of the relevant evidence in the case record," including, *inter alia*, the plaintiff's medical history, effects of treatment, reports of daily activities, and medical source statements. Social Security Ruling 96-8p, 1996 WL 374184, at *5 (emphasis in original). In addition to assessing Dr. Surber's opinion, the ALJ also addressed, *inter alia*, the plaintiff's testimony regarding his pain, his reported activities of daily living, his medical history, the effects of treatment, and the opinions of other DDS consultative physicians. For example, the ALJ noted that, while the plaintiff reported having "constant, severe and debilitating symptoms," the record contained very little supporting medical evidence and the plaintiff had only "sporadically sought medical treatment." (Tr. 20.) The ALJ also noted that the plaintiff did not use prescription pain medicine and performed daily activities such as "preparing simple meals, assisting with household chores and caring for the family cat." *Id.* The ALJ also addressed the opinions of Drs. Downey, Misra, Sweeney, and

Mr. Killian, none of whom opined that the plaintiff suffered from disabling impairments.[13] (Tr. 23.) In short, the ALJ's conclusion that the plaintiff could perform medium work was not based solely on Dr. Surber's opinion and was instead based on a review of the entire record. Because the ALJ gave only minimal weight to Dr. Surber's opinion, the ALJ was not required to incorporate Dr. Surber's lifting limitations into the plaintiff's RFC.

To the extent that the plaintiff also argues that the ALJ did not give "proper weight" to Dr. Surber's opinion, the Court also concludes that the ALJ appropriately evaluated Dr. Surber's opinion. The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[14] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the

---

[13] The plaintiff does not raise any issues regarding the ALJ's assessments of these medical opinions.

[14] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2);[15] *see also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).  This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Dr. Surber is not a treating source because he only examined the plaintiff on one occasion for the purpose of a consultative disability evaluation.  (Tr. 215-19.)  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating source because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). However, even though Dr. Surber is not a treating source, and thus the

---

[15] Effective March 26, 2012, the numbering for the treating physician rules changed.  Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

treating physician rule does not apply to him, the ALJ must still consider his medical findings in light of the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

The ALJ noted that the plaintiff saw Dr. Surber for a consultative evaluation and that the plaintiff reported "that none of his allegations [had] been proven or documented as valid by a physician." (Tr. 20.) The ALJ also noted that, other than decreased voluntary range of motion in the left shoulder, Dr. Surber "did not note any limitations regarding functional mobility in any of his other areas" of complaint. *Id.* The ALJ concluded that the record did not support Dr. Surber's opinion regarding the plaintiff's ability to stand or walk, and thus the ALJ decided to give his opinion less weight. (Tr. 23.) The record reflects that the ALJ gave appropriate consideration to Dr. Surber's opinion in light of the factors in 20 C.F.R. § 404.1527(c)(2), and to the extent that the ALJ rejected part of Dr. Surber's opinion, the ALJ adequately explained his rationale.

### 3. The ALJ's classification of the plaintiff's age was not reversible error.

The plaintiff contends that the ALJ erred in classifying his age because the ALJ referred to him as being fifty-five years old on the alleged onset date rather than sixty years old on the hearing date. Docket Entry No. 16, at 22. The defendant comes close to conceding that the ALJ erred in using the plaintiff's alleged onset date to calculate his age. *See Varley v. Secretary of Health and*

*Human Services*, 820 F.2d 777, 780 (6th Cir. 1987) ("[T]he claimant's age as of the time of the decision governs in applying the regulations.").[16]  Docket Entry No. 17, at 14.  However, the defendant argues that the ALJ's error was harmless.  *Id.* at 14-15.

In conducting his alternative step-five analysis, the ALJ found that the plaintiff "was 55 years old, which is defined as an individual closely approaching retirement age, on the alleged disability onset date (20 CFR 404.1563 and 416.963)."  The Court agrees with the defendant that any mistake as to the plaintiff's proper age classification was harmless error because it came during the ALJ's alternative step-five analysis.[17]  The ALJ had already resolved the plaintiff's claim at step four when he determined that the plaintiff could return to his past relevant work.  (Tr. 23-24.)  Importantly, age is not a relevant factor at step four.  20 C.F.R. § 404.1563.  The ALJ's step-four decision that the plaintiff could return to his past relevant work was supported by substantial evidence.  Therefore, even though the ALJ erred in referring to the plaintiff's age classification at step five, the ALJ's step-four decision is unaffected by that error.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgement on the record (Docket Entry No. 15) be DENIED and the Commissioner's decision be AFFIRMED.

---

[16] The Court in *Varley* also referenced the proper date as the date of the hearing. Although the plaintiff refers to the date of the hearing as the relevant date (Docket Entry No. 16, at 22), the Court notes that the plaintiff was also sixty years old on February 23, 2011, the date of the hearing decision.

[17] The Court does not find it necessary to address the defendant's alternative argument that the ALJ's classification of the plaintiff's age was harmless error because the plaintiff would not have been disabled under the Medical-Vocational Guidelines even if the ALJ had properly classified his age.  Docket Entry No. 17, at 14-15.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge